**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 12-cv-00999-MSK-CBS

**CHRISTINE WILLIAMS,**

      **Plaintiff,**

**v.**

**AUTO-OWNERS INSURANCE COMPANY,**

      **Defendant.**

---

**OPINION AND ORDER GRANTING SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment (**# 36**). The Plaintiff filed a Response (**# 40**), and the Defendant replied (**# 41**). Having considered the same, the Court

**FINDS** and **CONCLUDES** that:

## I.  Jurisdiction

The Court exercises subject matter jurisdiction under 28 U.S.C. § 1332.

## II.  Issue Presented

In this action, Plaintiff Christine Williams alleges that Defendant Owners Insurance Company ("Owners") failed to pay benefits that it owed to her under the uninsured/underinsured motorist ("UIM") provision of an auto insurance policy that Owners issued to Ms. Williams.

Ms. Williams asserts three claims, all under Colorado law: (i) breach of contract, (ii) bad faith breach of contract, and (iii) unreasonable denial of a claim in violation of C.R.S § 10-3-1115 and §10-3-1116.   Owners moves for summary judgment on all of Ms. Williams' claims.

1

### III.Material Facts

Based upon the evidence submitted by the parties, which the Court construes most favorably to the Plaintiff, the Court finds the following for the purposes of this motion:

On August 25, 2008, Ms. Williams was injured in a motor vehicle accident with another driver.  Ms. Williams promptly notified Owners of the accident, and then filed a claim with the other driver's insurer, GEICO.  GEICO accepted liability for the accident, but no settlement between Ms. Williams and GEICO occurred until January 3, 2012.  GEICO paid Ms. Williams the driver's total policy limit of $25,000.

Ms. Williams' policy with Owners provided maximum UIM coverage of $100,000.  Subject to that limitation, the UIM provision of Ms. Williams' policy provided that she was entitled to recover from Owners the "damages [she] is legally entitled to recover from" an "underinsured" driver.

On January 10, 2012, Ms. Williams demanded $100,000 in UIM coverage from Owners.  In her demand, she stated that she had more than $50,000 in unreimbursed medical costs and $60,000 in unreimbursed lost income caused by the accident in excess of the GEICO settlement.

Upon receipt of Ms. Williams' demand, Mark DeLeon, the Owners adjuster overseeing the claim, consulted with Amy Brugam, one of Owners' attorneys.  Mr. DeLeon and Ms. Brugam raised concerns about whether the medical records supplied by Ms. Williams supported her claims. Among other things, Ms. Brugam was "concerned that it seemed that her symptoms may have gotten worse over time"; Mr. DeLeon believed that "some of her alleged injuries were degenerative in nature, as opposed to traumatically caused by the accident", and they noted that despite Ms. Williams' claim for lost wages, none of her medical providers had placed her on

work restrictions.  Based upon these concerns, Ms. Brugam authorized Mr. DeLeon to offer to settle Ms. Williams' UIM claim for $50,000.

Owners conveyed the settlement offer orally on February 6, 2012, and followed it up with a written proposal on February 7.  At the same time, Owners requested that Ms. Williams provide further documentation.  Ms. Williams (through counsel) responded on February 21, 2012, providing the requested supplemental information and iterated Ms. Williams' demand for the full $100,000 policy limit.

On February 29, 2012, Owners' increased its offer to $75,000, although the record is largely silent about the reasons for that decision. On March 1, 2012, Ms. Williams repeated her demand for $100,000, but requested that Owners tender the $75,000 it had offered while she continued to "attempt to recover additional UM benefits" from it.  Owners declined to pay any sum without a release from Ms. Williams.  She commenced this action on March 16, 2012.

## IV. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

      If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed.R.Civ.P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward,* 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material

fact, no trial is required. The court then applies the law to the undisputed facts and enters

judgment.

      If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a prima facie

claim or defense, a trial is required.  If the respondent fails to produce sufficient competent

evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of

law.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

## V.  Analysis

### A.  Elements of Ms. Williams' claims

      Ms. Williams asserts three separate claims premised on her assertion that Owners

unreasonably denied payment of UIM benefits that she was owed under her policy.  However, as

will be explained below, a single element—the reasonableness of Owners' conduct—is common to all three claims.

### 1. Classic breach of contract

Under Colorado law, a plaintiff must establish four elements to prove a breach of contract claim: (1) the existence of a contract; (2) performance by the plaintiff; (3) failure to perform the contract by the defendant; and (4) damages suffered by the plaintiff as a result of the defendant's breach. *W. Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo. 1992). Here, the existence of a contract and performance by Ms. Williams are not in dispute. Owners contends that Ms. Williams cannot show that its refusal to pay the UIM benefits she demanded constitutes a breach of the contract.

The pertinent language of the policy provides that Owners "will pay compensatory damages . . . [that an insured] is legally entitled to recover from the owner or operator of an uninsured automobile because of bodily injury . . . ." It also provides that Owners need not make payment "until the limits of liability of all bodily injury bonds and insurance policies applying to the underinsured automobile and its operator have been exhausted by payment and settlements." Finally, it provides "[w]hether an injured person is legally entitled to recover damages [from Owners] and the amount of such damages shall be determined by an agreement between the injured person and [Owners]." Thus, the policy language imposes several conditions precedent to Owners' obligation to pay Ms. Williams: (i) Ms. Williams must have suffered bodily injury in an automobile accident caused by the driver of an uninsured or underinsured vehicle; (ii) Ms. Williams must have recovered the full amount of insurance available from the underinsured vehicle and operator; and (iii) there must be "an agreement between the injured person and [Owners]" regarding the amount of benefits payable under the UIM coverage.

Ms. Williams clearly satisfied the first condition at the time of the accident in 2008, and satisfied the second condition in January 2012 by settling with GEICO for the other driver's full policy limit.  Owners contends that  Ms. Williams cannot prove her breach of contract claim because the final condition precedent – agreement between Owners and Ms. Williams as to the remaining amount of her losses -- was not satisfied.  Put another way, Owners interprets the contract as requiring the parties to agree on the amount to be paid before any payment is due. Ms. Williams responds that the contract provision requiring an agreement prior to payment is contrary to public policy and caselaw, specifically, C.R.S. § 10-3-1115 and -1116 and *Baumann v. American Family Mut. Ins. Co.*, 2012 WL 122850 (D.Colo. Jan. 17, 2012) (slip. op.). Moreover, she contends that Owners should have paid the $75,000 that it offered, because such offer was a concession by Owners that it owed her <u>at least</u> that amount.

It is undisputed that the parties never reached agreement as to the amount of UIM benefits to which Ms. Williams was entitled.  Thus, at least by the plain language of the contract, Owners' obligation to pay UIM benefits never matured.  Whether the language in the contract requiring agreement between the parties is violative of public policy need not be determined today, but the Court notes that neither *Baumann*, the cases it relies upon, nor C.R.S. § 10-3-1115 and -1116, stand for the proposition that a contractual requirement that the parties reach agreement on the amount due and owing on a UIM claim before the contractual duty to pay arises is contrary to public policy.  *Baumann* examines the  tort of bad faith breach of contract, which, as explained below,  requires an insurer to act "reasonably" in handling and assessing the claim. C.R.S. § 10-3-1115 imposes a similar duty of reasonableness on the insurer.  Neither authority, however, purports to address the contours of a garden-variety breach of contract claim,

much less declare that policy language requiring an agreement on the amount of a claim before payment is due is void as against public policy.

Nevertheless, it is well-settled that all contracts, including contracts of insurance, contain a requirement that the parties exercise any discretion that the contract confers upon them in a manner that reflects good faith and fair dealing. *Goodson v. American Standard Ins. Co.*, 89 P.3d 409, 414 (Colo. 2004). In other words, where the contract permits Owners to exercise some manner of discretion in performing its contractual obligations, it is obligated to exercise that discretion consistent with the parties' reasonable expectations about the operation of the contract. *See City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006). Thus, although the UIM coverage language permits Owners to refuse to pay benefits until the parties have reached an agreement as to the amount of those benefits that should be paid, Owners is nevertheless required to act reasonably and in good faith in attempting to reach an agreement with Ms. Williams as to that amount.[1]  Thus, Owners can be liable to Ms. Williams for breach of contract if its failure to reach an agreement with her as to the amount of UIM benefits  was the result of Owners' bad faith.

### 2. Bad faith breach of contract

As noted, above, Colorado recognizes a special species of breach of contract claim arising in the insurance context. Because of the peculiar nature of insurance contracts and the disparity of bargaining power between an insurer and the insured, Colorado recognizes that a breach of an insurance contract, accompanied by bad faith conduct by the insurer, gives rise to

---

[1]  The duty of good faith and fair dealing thus prevents the situation Ms. Williams describes in her summary judgment response, in which "an insured [is required] to enter into a settlement agreement with Owners, **no matter how low the offer may be**, or commence litigation." (Emphasis added.)  Only offers that are consistent with principles of good faith and fair dealing would discharge Owners' contractual obligation to attempt to reach a fair agreement on a disputed claim.

tort liability under a theory commonly known as "bad faith breach of contract." *Sanderson v. American Family Miut. Ins. Co.*, 251 P.3d 1213, 1218 (Colo.App. 2010). To prove a bad faith breach of contract claim, an insured must show: (1) that the insurer acted unreasonably under the circumstances, and (2) the insurer either knowingly or recklessly disregarded the validity of her claim. *Goodson.,* 89 P.3d at 415. The reasonableness of the insurer's conduct is measured objectively, and is primarily (although not exclusively) informed by whether the insurer's justification for delaying or denying payment on the claim was "fairly debatable." *Sanderson*, 251 P.3d at 1217.

Thus, much like the requirement that Ms. Williams demonstrate, for purposes of her contract-law claim, that Owners took an unreasonable position in bad faith when negotiating over the amount payable on her claim, her tort claim for bad faith breach of contract requires essentially the same showing. For all practical purposes, the contract-based claim and tort-law claim are subject to the same analysis here.

3. Statutory claims

Colorado has effectively codified the bad faith breach of contract claim, requiring that "a person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant." C.R.S. § 10-3-1115(1)(a). The statute defines the term "unreasonabl[e]" as being a situation in which "the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action." C.R.S. § 10-3-1115(2). Pursuant to C.R.S. § 10-3-1116(1), a successful statutory claim warrants an award of double damages plus attorney fees.

Like the contract and tort claims,  the *sine qua non* of Ms. Williams' statutory claim is a showing that, in disputing her demand for the full UIM policy limits, Owners' took a position that was "unreasonable" or in bad faith.

Accordingly, the Court finds that all three claims asserted by Ms. Williams share a common element that she must ultimately establish: that Owners' conduct in failing to pay her UIM claim, immediately and in full, was unreasonable and bad faith conduct.  The Court then turns to the question of whether Ms. Williams' evidence, taken in the light most favorable to her, establishes a genuine dispute of fact as to whether Owners' actions were unreasonable or in bad faith.

### B.  Evidence

Generally, the question of whether an insurer's conduct was "reasonable" or not is one of fact, but in appropriate circumstances, such as where there is no genuine dispute of material fact, the question of reasonableness may be decided as a matter of law.  *Schuessler v. Wolter*, 310 P.3d 151, 162 (Colo.App. 2012).

Although Ms. Williams has the burden to establish the conduct which is unreasonable, her response brief does not precisely delineate the particular actions of Owners that she contends meet that standard.  She appears to suggest that it was unreasonable for Owners to make an "initial settlement offer [that] was less than [her] medical bills, [that] did not take into account her lost wages, and [that] did not compensate her for non-economic damages and interest."  In addition, she argues that "Owners offers no supporting facts as to how the settlement offer was determined" and that that the record "do[es] not show any indication that Owners investigated Ms. Williams' claim," which suggests that she considers such failure to be evidence of unreasonable behavior.

The Court cannot say that any of these actions, on their face, are intrinsically unreasonable.  Although it is undisputed that Ms. Williams' asserted an UIM claim with medical expenses that  exceeded Owners' initial settlement offer of $50,000,  it is also undisputed that Owners questioned whether the entirety of those claimed expenses were causally connected to the accident.  Similarly, although Ms. Williams sought lost wages in excess of Owners' initial settlement offer, the record reflects that Owners did not believe that there was sufficient support in the records submitted with Ms. Williams' claim..  Because neither party has provided the Court with the specific medical or lost wage records that were submitted to Owners,  the Court cannot say that Owner's concerns about the sufficiency of those records were  inherently unreasonable. [3]

It is also true that the record does not explain how Owners decided to offer the particular amounts that it did, but again, the Court cannot say that the absence of such disclosure is inherently unreasonable.  Parties to a contract often  make offers to settle a dispute over the contract's terms without a precise articulation of its reasons for selecting such a figure, and these settlement offers are typically informed by considerations that deny ready quantification, such as the offering party's perception of possible litigation outcomes or the expected costs of such

---

[3]	Ms. Williams makes much of the fact that Ms. Brugam, an attorney, did not consult with medical professionals about her doubts about  Ms. Williams' claimed injuries.  In some circumstances, it might be unreasonable for a person lacking medical qualifications to make medical determinations for an insurer.  In other circumstances, it may be that even a layperson without medical qualifications can reasonably question the medical aspects of a claim – *e.g.*  a layperson might reasonably doubt a claim seeking reimbursement for the costs of cancer treatment submitted as part of an auto insurance claim, or might question a claim for plastic surgery expenses where the medical record otherwise revealed no breaking of the skin.  Because the record here does not reveal the specific medical records that Ms. Brugam questioned, the Court cannot say that it was necessarily unreasonable for Ms. Brugam to doubt the compensability of those medical expenses without first consulting a medical professional.

litigation.  Ms. Williams points to no legal standard that obligated Owners to disclose its reasoning in making a settlement offer.

That takes the Court to the question as to whether, in the context of insurance industry standards, the nature and extent of Owners' investigation or its failure to disclose its reasoning underlying its settlement offer might be considered "unreasonable."  A deviation from accepted insurance industry standards in the handling of a claim can serve as proof that an insurer's actions were unreasonable.  *See Schuessler*, 310 P.3d at 161, *citing Bankruptcy Estate of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 524 (Colo.App. 2008); *Goodson*, 89 P.3d at 415 (emphasis added).  Proving the scope of industry standards typically requires "[t]he aid of expert witnesses." *Id.*

On this issue, Ms. Williams offers testimony from Bradley Levin, her designated expert on insurance industry standards.[4]  She submits only a small excerpt of Mr. Levin's deposition, totaling 12 pages.  Because this is the entirety of the evidence in the record that Ms. Williams offers as to insurance industry standards, the Court  examines it in close detail.

The first portion of the excerpt addresses Ms. Brugam's handling of Ms. Williams' claim for damages related to medical costs.  Mr. Levin criticizes Ms. Brugam's failure to consult with a medical professional to resolve her questions about Ms. Williams' medical claims, but when asked whether "Ms. Brugam [has] the capacity or training to review a claim file and reach a fair evaluation . . . without hiring medical people," Mr. Levin replied that "she may or she may not." (He never offers a final conclusion as to whether Ms. Brugam herself does or does not have that capacity).  Without knowing Ms. Brugam's skill or training, Mr. Levin states that "if she's not

---

[4]      Owners has challenged whether Mr. Levin's opinions offered on this issue are admissible under Fed. R. Evid 702.  The Court has scheduled, but not yet conducted, a hearing on that issue. For purposes of considering Owners' motion for summary judgment, the Court will assume that Mr. Levin's testimony will be admissible over a Rule 702 objection.

going to have medical people involved to assist her, then she doesn't have the right to be able to reject what the treating physicians are saying." Similarly, Mr. Levin states that "if you're going to reject [the treating physicians' representations], you need to have a reasonable basis for rejecting that.  And you can't just simply say, Oh, it seems like they are unrelated."

Mr. Levin does not state the basis for his conclusions that a layperson examining a claim must either consult with medical professionals or accept the treating physicians' opinions.  He does not identify whether this is his understanding of a standard imposed by law, whether it is a statement of current prevailing practice in the insurance industry, a statement of his belief as to the best practices that the insurance industry should follow, or merely his own personal opinion as to what should have been done in this case.  If Mr. Levin were articulating a standard imposed by law or one that is customarily observed in the insurance industry, such evidence might be sufficient to demonstrate that Owners' failure to follow such a practice was unreasonable.  But if Mr. Levin is merely stating an aspirational standard that is not actually in use in the insurance industry, or is merely offering a personal view as to what he would have liked to have seen Owners do, such opinions are insufficient to carry Ms. Williams' burden of showing that Owners' conduct was unreasonable.

 Mr. Levin's second opinion is that, when assessing an insured's claim for medical expenses, the insurer must have a "reasonable basis" for its assessment.  But again, the source of such statement it not offered.  Furthermore Mr. Levin offers no definition of what the insurance industry considers a "reasonable basis" for assessment, or explains how Ms. Brugam's analysis was deficient.[5]  Thus, Mr. Levin's testimony establishes no industry standard to objectively

---

[5]     Indeed, later in the excerpt, Mr. Levin makes clear that he does not even know what Ms. Brugam actually did.  He is shown certain materials from Owners that, he concedes, he had not reviewed before formulating his opinions and writing his report.  Based upon these materials,

evaluate Ms. Brugam's investigation of Ms. Williams' claim for medical costs under the UIM provision of the contract.[6]

The lengthiest portion of Mr. Levin's deposition (from page 102 to the top of page 109 of the excerpt) is largely devoted to his contention that Owners was unreasonable in how it maintained its own internal records. With regard to the the steps Ms. Brugam took in evaluating Ms. Williams' medical records and arriving at the settlement offers, he states that 'it is incumbent upon claims handlers to write all material aspects of the handling of the claim in the file. It has to be reflected there. That's an absolute, established standard within all the insurance companies I've ever dealt with." However, it is clear from this record that Mr. Levin is not contending in this portion of the excerpt that Owners' actions towards Ms. Williams were somehow unreasonable, merely that Owners' own internal recordkeeping was insufficient (and even below industry standards). At no point does Mr. Levin suggest that this lack of internal documentation caused Owners to act unreasonably towards Ms. Williams; rather, he simply asserts that the lack of internal documentation frustrated his ability to deduce more about how Owners handled Ms. Williams' claim: "What I'm telling you, though, is it has to have some substantiation, and the substantiation is not in the claim file. I don't know what she did, period." Even assuming that Owners did violate insurance industry standards in failing to internally

---

Mr. Levin states that "either Ms. Brugam either consulted these other folks and she just decided not to write it down, which is inappropriate, or she didn't consult outside authorities and that was inadequate as well."

[6]     The Court also notes Ms. Williams' UIM demand letter listed roughly $50,000 in medical claims, and an additional sum as lost wages. In response, Owners simultaneously offered Ms. Williams a $50,000 settlement and requested additional information about her lost wage claim. One might conclude, then, that Owners' settlement offer fully credited the statements of Ms. Williams' treating physician as to the nature and extent of her physical injuries -- as Mr. Levin suggests Owners should have done – while simultaneously rejecting the entirety of Ms. Williams' wage loss claim, pending her submission of additional information.

document the reasons for its decisions, the record contains no evidence that such conduct was unreasonable towards Ms. Williams.

The final portion of the excerpt of Mr. Levin's testimony concerns Ms. Brugam's handling of Ms. Williams' wage loss claim. Mr. Levin notes that Owners' internal records show that Ms. Brugam determined that she needed additional tax records to evaluate Ms. Williams' wage loss claim. Mr. Levin initially states that he believes her assessment was unreasonable because "she doesn't explain why." He is then asked to examine the spreadsheet that Ms. Williams initially submitted in support of her wage loss claim, and asked whether "this [is] the type of documentation that a reasonably prudent person would rely upon to make a large monetary payment, say $ 60,000," to which Mr. Levin responds "It might." Pressed on that point – asked whether "you were going to evaluate Ms. Williams' dog grooming business for purposes of buying it, and you wanted . . . documentation of income[,] would you rely upon [the spreadsheet] to make that kind of decision?" – Mr. Levin responded "no." He was then asked whether "a reasonably prudent person" would rely upon this to make any kind of important business decision to which he responded "probably not." Mr. Levin goes on to concede that "I don't think it was unreasonable [for Owners] to ask for tax returns," but opines that "it should have been asked for a lot sooner than this" and that "you need to just simply explain somehow why it is that [the spreadsheet] is inadequate."

At best, then, Mr. Levin's opinion is that Owners acted unreasonably by: (i) not requesting Ms. Williams' tax records earlier,[7] and (ii) by not explaining to her why the

_____

[7] As noted above, Ms. Williams made her initial claim to Owners on January 10, 2012, and Owners requested additional documentation at the time it made its initial settlement offer on February 6, 2012, exactly 30 days later. Curiously, Mr. Levin's opinion – that Owners should have made its request for additional documents "a lot sooner than this . . I say a lot" – seems to be somewhat inconsistent with his suggestion that Owners should have "consult[ed] with [some

spreadsheet she had submitted was insufficient.  Once again, Mr. Levin does not clearly state that

his opinions on these points are derived from industry standards – *i.e.* that insurance industry

practices require requests for additional documentation to be made within a specific time after

the initial claim is made, or require a specific degree of explanation as to why a tendered

document is insufficient – or whether Mr. Levin is simply stating a personal belief that Owners

could (or even should) have acted more expeditiously in these particular circumstances.  If

anything, the deposition excerpt suggests the latter: Mr. Levin couches his statements in terms

consistent with personal expectations rather than objective external standards, explaining that "I

would like to have seen" Owners offer a more comprehensive explanation.  In the absence of

evidence suggesting that insurance industry standards required Owners to do something

differently, Mr. Levin's personal preference that Owners should have acted more expeditiously

or offered more explanation is insufficient to establish that Owners acted unreasonably in

requesting additional wage loss information.

     The Court finds that the excerpt from Mr. Levin's deposition that appears in the record

fails to establish what industry standards were so as to create a genuine dispute of fact as to

whether any of Owners' actions contravened them..  In the absence of such evidence,  Ms.

Williams has not come forward with evidence to demonstrate a triable question as to whether

Owners' conduct towards her was unreasonable or in bad faith.  Accordingly, Owners is thus

entitled to summary judgment on all claims against it.

---

forensic people inside] or you consult with some outside person to say, Hey, what do we need to
do in order to evaluate this."  On the one hand, Mr. Levin appears to suggest that Owners should
have sought more information almost immediately, and on the other hand, he appears to contend
that Owners should have consulted with others about what additional information to request.

IT IS THEREFORE ORDERED that:

(1) Defendant's Motion for Summary Judgment **(# 36)** is **GRANTED**.  The Clerk of the

Court shall enter judgment in favor of Owners on all the claims in this action and shall

close the case.

Dated this 25th day of March, 2014.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge